IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

PONTELL BRYANT,

          Plaintiff,

    v.

S/C.O. HIGBEE, S/C.O. J.
RIVERA, S/C.O. S. HERMAN,
OFFICER B. BAGLIANI, SGT. R.
DOWNS, S/C.O. M.L. COPE, S/C.O.
R. BUTLER, S/C.O. B. CURTIS,

          Defendants.

HONORABLE JEROME B. SIMANDLE

Civil No. 13-2823 (JBS/AMD)

**OPINION**

APPEARANCES:

Mr. Pontell Bryant
552782/311381-C
Bayside Prison
P.O. Box F-1
4293 Rt. 47
Leesburg, NJ 08327
    Plaintiff <u>pro</u> <u>se</u>

Gregory R. Bueno, Esq.
Office of the Attorney General
State of New Jersey
25 Market Street
P.O. Box 112
Trenton, NJ 08625
    Attorney for Defendants

**SIMANDLE, District Judge:**

## <u>Contents</u>

I.   INTRODUCTION ............................................ 2
II.  BACKGROUND .............................................. 3
  A.  Factual Background ..................................... 3
  B.  Procedural Background ................................. 14

III. STANDARD OF REVIEW........................................ 19
IV. ANALYSIS................................................. 21
  A.  Constitutional Claims against Defendants in Their Official
  Capacities................................................. 21
  B.  Plaintiff's state-law negligence claim and the New Jersey
  Tort Claims Act............................................ 23
  C.  Constitutional Claims and Qualified Immunity .......... 28
    1.  Qualified Immunity Overview.......................... 29
    2.  Eighth Amendment Excessive Force Claim............... 32
    3.  First Amendment Retaliation Claim.................... 44
    4.  Fourteenth Amendment Due Process Claim............... 51
    5.  Fourteenth Amendment Equal Protection Claim.......... 55
  D.  Administrative Exhaustion under the PLRA .............. 56
V. CONCLUSION............................................... 60

I. **INTRODUCTION**

Plaintiff Pontell Bryant (hereinafter "Plaintiff" or

"Bryant"), acting pro se in this matter, filed suit against

various correctional officers for a number of claims arising out

of alleged assaults in June of 2012. Plaintiff cites causes of

action arising from both 42 U.S.C. § 1983 and New Jersey law.

While Plaintiff is currently incarcerated at Bayside Prison in

Leesburg, New Jersey, his allegations relate to a period of time

when he was incarcerated (and Defendants were employed as

correctional officers) at South Woods State Prison ("SWSP").

The crux of his lawsuit, as the Court presently understands

it, are allegations of excessive force and retaliation, stemming

from two assaults Plaintiff alleges to have taken place on June

12, 2012 and June 15, 2012. Plaintiff pleads causes of action

for violations of his constitutional rights under the Eighth

Amendment, the First Amendment, and the Fourteenth Amendment; he also pleads a cause of action for negligence under New Jersey law. [Docket Item 76.]

This matter is before the Court on Defendants' Motion for Judgment on the Pleadings and for Summary Judgment. [Docket Item 149.] Plaintiff filed a Response in Opposition. [Docket Item 153]. Defendants filed a Reply in Support of their Motion. [Docket Item 160.] Subsequently, Bryant filed a supplemental exhibit to his Response [Docket Item 161]; in response to this supplemental exhibit, Defendants filed a letter requesting leave to file supplemental briefing addressing this exhibit and in further support of their motion [Docket Item 163].

For the reasons set forth below, the Court grants in part and denies in part Defendants' motion for judgment on the pleadings and for summary judgment. The Court also denies as moot Defendants' request to file supplemental briefing addressing Plaintiff's additional exhibit and orders an evidentiary hearing on the subject of administrative exhaustion.

## II. BACKGROUND

### A. Factual Background

In June of 2012, Plaintiff was incarcerated at SWSP in Bridgeton, New Jersey. [Docket Item 149-2 ¶ 27.] Plaintiff alleges that he was assaulted twice that month by correctional

officers at that facility.

First, Plaintiff claims that he was assaulted at SWSP on
June 12, 2012 at around 9:25 AM by C.O.s Janda, Rivera, Curtis,
and Downs [Docket Item 76 ¶¶ 10, 12-13] and that C.O.s Clark,
Butler, Curtis (again), and Cope "came to join in" the assault.
Id. ¶¶ 11-12. He alleges that this assault took place by means
of punches and kicks while Plaintiff was in restraints, and that
such assault constituted excessive force. Id. ¶¶ 10-13. In his
response in opposition, he elaborates on this allegation as
follows: "[O]n June 12, 2012 defendants Janda, Rivera, Downs,
Curtis, Cope, [and] Butler were escorting me from Unit 2-1-R to
center command holding cell at 9:25 am approx. Defendants Downs
and Cope threw Plaintiff to the cell floor while Curtis, Butler,
Rivera, and Janda arbitrarily punched and kicked me all over my
body while I was in restraints[,]" causing physical injury and
emotional distress. Plaintiff continues: "I was not provided
with medical treatment." [Docket Item 153 at 1.] In support, he
cites to his deposition testimony. [Id. at 1-2, citing Docket
Item 149-20.]

Second, Plaintiff claims that C.O.s Herman, Higbee, and
Bagliani assaulted him on June 15, 2012 at approximately 9:45
AM; Herman allegedly "yell[ed] this is for Officer Rivera[,]"
and Bagliani and Higbee allegedly assaulted Plaintiff while

escorting him from a detention area to "courtline." [Docket Item 76 ¶¶ 15-17.] Plaintiff alleges that this assault led to his hospitalization in the infirmary for approximately two weeks. Id. ¶ 16. In his response in opposition to the instant Motion, Plaintiff elaborates on this incident as follows: "On June 15, 2012 while being escorted back from courtline hearing to detention unit cell room, defendants Jackson, Higbee and Herman and Bagliani punched and kick[ed] my body in retali[a]tion of defendant Rivera (at which time Herman yelled out 'this is for Rivera')[.]" [Docket Item 153 at 2.] Plaintiff alleges that this caused him "pain, suffering, physical injury and emotional distress at which time (a few days later) plaintiff was having chest pains and was placed in the infirmary for two weeks!" Id.

Plaintiff's medical records from June and July of 2012 indicate as follows:

- On June 11, 2012, Plaintiff complained of hip pain. [Docket Item 151-1 at 87.]

- On June 12, 2012, Mary Ellen Green, RN, wrote a "Chart Note for holding cell eval," wherein she stated that Plaintiff was, on that date, "seen in holding cell, prior to transfer to detention. I/M [inmate] denies any SI/HI [suicidal ideation/homicidal ideation] and has no abrasions or lacerations on upper torso and has old tatoos [sic] on arms. Medically cleared for transfer to detention." [Docket Item 151 at 2.]

- On June 14, 2012, Plaintiff's medical records reflect an "Office Visit: Nurse Sick Call" for an unrelated skin condition. [Docket Item 151-1 at 84-86.]

- On June 23, 2012, Plaintiff had an abnormal EKG after complaining of chest pain. [Id. at 62, 76, 78-79.] It appears that this was the date he was transferred to the infirmary. He also requested a renewal of naproxen to address his "[right] hip pain." [Id. at 83-84.]

- On June 24, 2012, during infirmary rounds, Plaintiff "denie[d] any pain, no complaints made, no acute distress." [Id. at 69.]

- On June 25, 2012, a note in Plaintiff's medical records states: "change from infirmary to ECU [Extended Care Unit] status. Plan: awaiting lab results, continue Tylenol for pain." [Id. at 57.] Also on that date, Plaintiff complained of chest pain and lightheadedness while he was visited in the infirmary. [Id. at 60-61, 63.]

- It appears that Plaintiff provided urine for urinalysis on or about June 25, 2012 at 11:00 AM; the results of that urinalysis showed the presence of "occult blood" in his urine at a level of "3+", a condition also known as hematuria. [Id. at 58-59.]

- On June 26, 2012, the medical staff noted the presence of blood in Plaintiff's urine and stated "[w]ill recheck." [Id. at 53.]

- It appears that Plaintiff again provided a urine sample on June 26, 2012 [id. at 52-53], and on that date, the urinalysis now revealed only "trace" amounts of occult blood. [Id. at 51.]

- On June 27, 2012, Dr. William Briglia, DO, noted the repeat of the urinalysis "without significant hematuria." [Id.]

- On June 26, 2012, Plaintiff spoke to Troy Heckert, Psy.D., at SWSP; Heckert reported that Plaintiff stated that he was in Detention "because he wrote a remedy form stating that the Sgt. [sic] and tier officer were making racial slurs against him. He added that while in Detention, he was being harassed by officers and was not regularly receiving meals. He said he has written multiple remedy forms about this

and has written to SID [Special Investigations Division], but no one from SID has spoken with him." [Docket Item 151-2 at 3-4.]

- Plaintiff's medical records from June 27, 2012 through July of 2012 reflect test results showing abnormally elevated liver enzymes. [Id. at 32-38, 42, 47-48.]

Defendants' version of the events of June 12 through June 15, 2012, is quite different. Defendants allege that, on the morning of June 12, 2012, Plaintiff exposed his penis to Defendant Rivera, who "charged him with engaging in prohibited act .052, making sexual proposals or threats to another." [Docket Item 149-2 ¶ 30.] Plaintiff was given a hearing on this disciplinary charge "where he was given the opportunity to make statements and present evidence and witness statements on his behalf[,]" and requested and was given the assistance of an inmate counsel substitute; he was ultimately found guilty. Id. ¶¶ 31-33. His sanction was "fifteen days' detention with credit for time served, ninety days' administrative segregation, and sixty days' loss of commutations time[,]" and his guilty finding was affirmed by SWSP administration. Id. ¶¶ 34-35. Plaintiff did not, during "this adjudication," "adduce any evidence that the subject disciplinary charge was filed against him in retaliation for refusing to assault an inmate for defendant Rivera or for any other retaliatory purpose"; nor did he appeal the finding of guilt to the Appellate Division of the Superior Court of New

Jersey. Id. ¶¶ 36-37.

Defendants contend that Plaintiff was moved from his cell to pre-hearing detention on June 12, 2012 by defendants Butler and Cope and by non-defendant Sgt. Janda, but that they escorted him without incident. Id. ¶¶ 39-40. Plaintiff was then moved to a different cell (1043 in Detention A-Pod) on that date by defendants Downs and Curtis and non-defendant CO Clark; Defendants contend that those officers also escorted Plaintiff without incident. Id. ¶¶ 41-42.

Defendants next state that the evidentiary record reflects that, on June 13, 2012, defendant Herman and non-defendant CO Vargas were in the process of removing Plaintiff from that cell to have him appear for the administrative hearing on the .052 charge, when Plaintiff made a sexual proposition to them while stroking his exposed penis. Plaintiff was given a second .052 charge for this new incident. Id. ¶¶ 53-54. He was subsequently found guilty of this charge on June 20, 2012 after he was afforded "notice and an opportunity to defend against the charge." Id. ¶¶ 54-55. Again, Defendants state, Plaintiff adduced no evidence that this second charge was filed in retaliation for refusing to assault an inmate at defendant Rivera's behest or for any other retaliatory reason. Id. ¶ 56. This charge was also affirmed by SWSP administration. Id. ¶ 57.

On June 15, 2012, Plaintiff submitted a "request for polygraph" in the context of his hearings on the two .052 charges; the Hearing Officer, N. Morales-Pitre, stated that "Inmate's Reason for Request" was that "Bryant believes the 1st charge was in retaliation for writing up SCO Rivera & Sgt. Janda--and that the 2nd charge was in retaliation to the 1st charge." [Docket Item 149-22 at 19.]

In response to the allegation that Plaintiff was assaulted by defendants Higbee, Herman, Bagliani, and "non-answering defendant Jackson" on June 15, 2012, Defendants assert the only evidence for such a proposition is Plaintiff's own testimony, and that "the record confirms that defendants Butler, Cope, Curtis, and Downs had no interaction with Plaintiff at all on June 15, 2012." [Docket Item 149-2 ¶¶ 58-60.]

Plaintiff was transferred to the Extended Care Unit on June 23, 2012, and remained there under medical care until July 2, 2012, when he was transported to New Jersey State Prison. Id. ¶¶ 66-81.

In an Inmate Remedy System Form ("IRF") dated "6-15-12," Plaintiff stated that on June 15, 2012 at (what appears to the Court to read) 9:30 AM, "S/C.O. Jackson came to get me with another unknown officer and at time this Officer Jackson he push me on the bed handcuff my [illegible] and punch me once in the

back of the head and said watch what you do to [illegible] when she is around near your cell #1042. This officer breached his duty when using excessive force. S/C.O. Jackson herein at N.J.D.O.C. at S.W.S.P. here in at all time [illegible] for the responsible safety, care and supervision of all prisoners. This is a pattern of abuse [illegible] I have been threaten[ed] several times and assault [illegible] this writer fears for his life. This incident occur[red] while the officers came to take me to courtline." [Docket Item 149-24 at 2.[1]] This IRF was addressed to "S.I.D. & Administrator Holmes"; Part II, where an administrator records what is done with the IRF, reflects that the IRF was forwarded to SID on July 13, 2012 with a subject of "Excessive Force." Id.

On July 10, 2012, Plaintiff's mother, Londela Bryant, sent a fax to SID "Attn.: Mr. Sierra" and enclosed a letter from Plaintiff to her. [Docket Item 151-4 at 2-4.] Ms. Bryant stated her belief that defendant Rivera fabricated the .052 charge against Plaintiff "after he refuse[d] to assault another male inmate for her." Ms. Bryant also raised the concern that Plaintiff had previously filed a complaint against "the Sgt." who was responsible for investigating Rivera's disciplinary

---

[1] This exhibit also appears as Docket Item 151-3 at 7.

charge, setting up a conflict of interest. Id. at 2.

Plaintiff's letter, which was addressed to his mother and appears to be dated "6-13-12," states that he had filed complaints against Janda and Curtis on June 6, 2012 for "racial and bias slurs," and that Janda was responsible for locking him up one week later on the sexual proposal charge. Id. at 3. Plaintiff's letter outlines defendant Rivera's alleged request to have Plaintiff assault another inmate named Jackson. Plaintiff states: "I wrote SID and told them but I didn't hear anything from them yet, please call S.I.D. and let them know that I have been threaten[ed] by several officers to keep my mouth shut. They come by my door and tell me watch what I eat and that after I see courtline I'm gonna get a Southwoods Special. I wrote all of this on a remedy form so administrative just has to check for the 3 reme[]dy forms." Id. He continues: "I don't like to be sexually harass and threaten to have my own penis up my butt. I wrote that first reme[]dy form on 6-6-12 on the Sgt. then on 6/12/12 this the same Sgt. to lock up me and investigating the matter." Id. at 4.

While the fax from Ms. Bryant is dated July 10, 2012, the records of the SID investigation state that SID "received a [NJDOC] Central Officer Referral concerning SWSP I/M Bryant, Pontell" on "06-27-2012." ["SID Report," Docket Item 151-3 at

2.]² The SID Report takes into account both the letter to

Plaintiff's mother as well as the 6-15-12 IRF filed by

Plaintiff. Id.

SID Senior Investigator Achinko and Investigator Williams

interviewed Plaintiff on July 17, 2012 "concerning this matter."

Id. at 3. Plaintiff repeated his allegations: that Janda and

Curtis had used racial slurs towards him; and that Rivera had

asked him to beat up another inmate; that when he refused, she

"issued him the .052 institutional charge as retribution for not

accepting her request." Id. Plaintiff alleged that he had been

threatened and harassed by Bagliani, Higbee, and Jackson. Id.

Plaintiff also told the SID investigators that the subsequent

.052 charge from Herman and Vargas was false and instituted

against him "as a form of punishment because he complained about

the charged issued to him by SCO Rivera." Id. The SID Report

continues:

> I/M Bryant then alleged that SCO Jackson and SCO
> Higbee had come in his cell to escort him to a
> courtline hearing on 06-15-2012. I/M Bryant alleged
> that after hand and leg restraints were applied, SCO
> Jackson punched him in the back of the head one time,
> causing a bruise to his head. SCO Jackson then stated
> to never expose himself to a female staff member

---

² The SID Report states that Plaintiff's letter to his mother was
"dated 06-20-2012"; however, as stated above, the Court sees an
apparent date of "6-13-12" on the top right corner of the first
page of the letter. [Cf. Docket Item 151-3 at 2 with Docket Item
151-4 at 3.]

again, because if he did, he would get beat up. SCO Jackson then threatened to cut off I/M Bryant's penis and stick it in I/M Bryant's rectum. I/M Bryant identified SCO Higbee as the only witness, and also stated that he never told anyone from custody staff or medical staff about the incident or the alleged bruise on his head.

When questioned, I/M Bryant stated that all of his concerns and allegations had been addressed during this interview, and that he did not wish to provide any additional written statements.

Id. at 3-4. SID subsequently interviewed Janda, Rivera, Bagliani, Higbee, Herman, Vargas, Jackson, and Curtis, all of whom denied any wrongdoing. Id. at 4-5. SID concluded: "[D]ue to a lack of any witnesses, evidence and the statements of denial by staff members identified, the allegations made against said staff members by I/M Bryant cannot be substantiated in any manner." Id. at 5.

The evidentiary record also contains three "Special Custody Reports," prepared (respectively) by COs Cope,[3] Butler, Clark, and Downs. [Docket Item 149-22 at 14-16.] Each report describes an "Inmate Escort" involving "I/M Bryant" on June 12, 2012, and each describes the escort or escorts (in the space for the corrections officer to "Describe Incident") as having taken

---

[3] CO Cope's Special Custody Report has the date listed as June 13, 2012. However, the Court agrees with Defendants [Docket Item 149-2 ¶ 41] that this represents an error by CO Cope and that the actual date was June 12, 2012.

place "without incident." Id. Each report is dated within minutes of the escort or escorts; no report is dated later than 10:40 AM on June 12, 2012. No other substantive information appears in these reports.

**B. Procedural Background**

Plaintiff initially filed a Complaint in this Court on May 2, 2013 [Docket Item 1]; the Court deemed it filed on January 29, 2014 [Docket Item 2]. [Docket Item 1.] After further proceedings, defendants Higbee and Herman moved for summary judgment for failure to exhaust administrative remedies pursuant to the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a) [Docket Item 35] (among other reasons); defendants Rivera and Bagliani subsequently raised the same motion [Docket Item 49].

Plaintiff filed a letter opposing the motion for summary judgment, wherein he contested Defendants' allegation that he had not properly exhausted his administrative remedies. [Docket Item 40.] Defendants alleged in their motion that Plaintiff never filed an initial Inmate Remedy Form ("IRF") with regard to any alleged assault [Docket Item 35-1 at 9-11]; however, Plaintiff responded, "Plaintiff did file and exhaust all administrative remedies while in South Woods State Prison infirmary prior to commencing this action. Plaintiff was

interview[ed] twice (2) by the Special Investigation Department because Plaintiff['s] administrative remedies was [sic] forwarded to their department (Note: see Special Investigation Department for filed grievance)[.]" [Docket Item 40 at 1.] He further stated: "Plaintiff did raise specific complaints against defendants pertaining to the assault made in this complaint by utilizing the inmate grievance system so that meaningful response may be generated and the grievance was forwarded to Special Investigations Department and plaintiff was interview[ed] twice by ca[]mera video and audio recorded." [Docket Item 40 at 2.]

The Court subsequently denied the motion of Higbee and Herman without prejudice, stating that there was "a dispute as to whether Plaintiff's compliance with the administrative remedy system was substantial. There is a reasonable inference that Plaintiff duly filed a grievance form, as he claims, because he was interviewed about his assault claim. The absence of such a form in the prison records may not be dispositive of the issue of exhaustion if the institution was aware of the incident and had the opportunity to investigate it when the claim was fresh, which is a paramount purpose of the administrative exhaustion requirement." [Docket Item 55 at 3.] The Court then ordered Defendants to provide Plaintiff with discovery. Id. Defendants

Rivera and Bagliani subsequently voluntarily withdrew their motion without prejudice to renewal. [Docket Item 57.]

Plaintiff then filed an unopposed motion to amend the complaint to add additional parties [Docket Item 65] and filed an Amended Complaint [Docket Items 76, 78, 79] naming Corrections Officers Butler, Cope, Curtis, and Downs as additional defendants.

Subsequent discovery practice in this case revealed that Plaintiff had indeed filed an IRF regarding an assault by certain Defendants alleged to have occurred on June 15, 2012. As Defendants state:

> None of the inmate remedy forms Plaintiff filed which were actually kept in the IRF database of each correctional facility where he was housed, mention the allegations made against the Defendants in the Amended Complaint. . . . Ordinarily, the absence of a particular IRF in the prisons' databases would indicate that an inmate had failed to utilize the NJDOC's inmate remedy system. However, there was one IRF submitted by Plaintiff that was mistakenly not retained in the facilities' databases. This IRF was later produced in discovery and has been affixed to this motion [as Exhibit R]. This IRF, along with correspondence from Plaintiff to his mother which was forwarded to correctional authorities by Plaintiff induced the NJDOC's Special Investigations Division (SID) to conduct an investigation into the allegations raised therein. This IRF was inadvertently not returned to Plaintiff, and therefore he was unable to fill out [] Part IV, the administrative appeal portion of the form, which would lead to a review of the matter by the correctional facility's administrator.

[Docket Item 149-2 ¶¶ 16-18, emphasis and internal citations

removed.] Defendants furnished the affidavit of Kevin Koch, a senior investigator with the New Jersey Department of Corrections Special Investigations Division, who stated therein:

> Attached as Exhibit Q[, Docket Item 151-3,] is a true and correct copy of a SID Investigation Report dated June 27, 2012. The investigation discussed therein commenced when plaintiff, Pontell Bryant (1) submitted an Inmate Remedy System Form (IRF)[, Exhibit R, Docket item 149-24,] wherein he claimed that numerous corrections officers engaged in various forms of misconduct while he was housed at South Woods State Prison, and (2) when it received a letter he wrote to his mother which was received by the Department of Corrections on June 20, 2012[, Exhibit S, Docket Item 151-4]. . . . [The IRF included as Exhibit R] was inadvertently not returned to Bryant at any point during, or upon the SID's completion of its investigation regarding the allegations therein. . . . Exhibits Q through S comprise the SID's entire file regarding complaints made by Bryant regarding South Woods State Prison corrections officers' purported misconduct that allegedly took place in June 2012. There are no other SID investigations involving Bryant from this time period. . . . Aside from the IRF that comprises Exhibit R, there are no other IRFs in the custody or control of the SID that were not also kept in South Woods State Prison's IRF database.

[Docket Item 149-9 at 1-2.]

Defendants submit that, although "Plaintiff could not have filled out the administrative appeal portion of the very same form" (inasmuch as he never received it back from SID or any other administrator), Plaintiff could nevertheless have filed an additional IRF to ask what the status was of the first IRF, in accordance with "the NJDOC's Inmate Handbook, which is referred to in South Woods' Handbook, [which] states in relevant part:

If your Inmate Remedy System form was not responded to or returned to you in the established response time frame of 30 business days for a routing inmate remedy system form, you may submit another Inmate Remedy System form noting the date the original Inmate Remedy System form was submitted.

Id. ¶ 19.

Defendants submit that the IRF describing an assault on June 15, 2012 does not allege any wrongdoing by any named, represented defendant in this action (but rather only an assault by "SCO Jackson, an unrepresented defendant who is now deceased"), and that "no IRF on file with the NJDOC's inmate remedy system databases" refers to any incident of excessive force or retaliation that occurred on June 12, 2012. Id. ¶¶ 21-22.

In response, Plaintiff states: "Plaintiff did file and exhaust all administrative remedies (note: Plaintiff was transfer[red] to another facility within two weeks of the incident when Plaintiff reported and via phone calls from Plaintiff['s] family to administrator Holmes and Special Investigation Division, Plaintiff was interview[ed] twice by Special Investigation Division at New Jersey State Prison in the year of 2012 (re: June 12, and 15, 2012 incident [sic])[.]" [Docket Item 153 at 1.] He reasserts that he "did raise specific complaints against each defendant[] pertaining to the harassment, racial remarks (slurs)[,] assault, verbal threats,

sexual[] harassment, [and] retaliation made in this complaint by
utilizing the inmate grievance system so that meaningful
response may be generated and the grievances [were] forwarded to
Special Investigation Division and area supervisors. . . .
Defendants were all on written notice of violations via
grievances filed by Plaintiff and verbal phone calls by
Plaintiff['s] family." Id. at 2.

Defendants subsequently filed the instant Motion.

## III. STANDARD OF REVIEW

Defendants move for judgment on the pleadings, F.R.C.P.
12(c), as well as summary judgment, F.R.C.P. 56(a).

Federal Rule of Civil Procedure 12(c) permits a party to
move for judgment on the pleadings "[a]fter the pleadings are
closed—but early enough not to delay trial[.]" FED. R. CIV. P.
12(c). Judgment on the pleadings may be granted only where the
moving party "clearly establishes" the absence of any "material
issues of fact," and demonstrates that judgment should be
entered in its favor "as a matter of law." DiCarlo v. St. Mary
Hosp., 530 F.3d 255, 259 (3d Cir. 2008); see also Rosenau v.
Unifund Corp., 539 F.3d 218, 221 (3d Cir. 2008) (same).

In applying this standard, however, the Court must "view
the facts presented in the pleadings and the inferences to be
drawn therefrom in the light most favorable to the nonmoving

party," <u>Jablonski v. Pan Am. World Airways, Inc.</u>, 863 F.2d 289, 290 (3d Cir. 1988), and must <u>narrowly</u> confine its inquiry to the allegations of the pleadings and their exhibits, matters of public record, and undisputedly authentic documents that form the basis of the claims.[4] <u>See, e.g.</u>, <u>Ettinger & Assocs., LLC v. Hartford/Twin City Fire Ins. Co.</u>, 22 F. Supp. 3d 447, 449 (E.D. Pa. 2014).

At summary judgment, the moving party bears the initial burden of demonstrating that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); <u>accord</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986). In reviewing a motion for summary judgment, the court is required to examine the evidence in a light most favorable to the non-moving party, and resolve all reasonable inferences in that party's favor. <u>Hunt v.</u>

---

[4] In other words, courts review Rule 12(c) motions under the same standard that applies to motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6). <u>See, e.g.</u>, <u>Spruill v. Gillis</u>, 372 F.3d 218, 223 n.2 (3d Cir. 2004); <u>Turbe v. Gov't of V.I.</u>, 938 F.2d 427, 428 (3d Cir. 1991).

<u>Cromartie</u>, 526 U.S. 541, 552 (1999); <u>Wishkin v. Potter</u>, 476 F.3d 180, 184 (3d Cir. 2007).

A factual dispute is material when it "might affect the outcome of the suit under the governing law," and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). The non-moving party "'need not match, item for item, each piece of evidence proffered by the movant,'" but must simply present more than a "mere scintilla" of evidence on which a jury could reasonably find for the non-moving party. <u>Boyle v. Cty. of Allegheny Pennsylvania</u>, 139 F.3d 386, 393 (3d Cir. 1998) (quoting <u>Anderson</u>, 477 U.S. at 252). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," no genuine issue for trial exists and summary judgment shall be granted. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citation omitted).

**IV. ANALYSIS**

**A. Constitutional Claims against Defendants in Their Official Capacities**

Defendants argue that the Court should "dismiss all constitutional claims against the Defendants in their official capacities because they are not 'persons' amenable to suit under

the Eleventh Amendment and 42 U.S.C. § 1983[,]" citing, <u>inter alia</u>, <u>Quern v. Jordan</u>, 440 U.S. 332 (1979); <u>Kentucky v. Graham</u>, 473 U.S. 159 (1985); and <u>Will v. Michigan Dep't of State Police</u>, 491 U.S. 58 (1989). [Docket Item 149-1 at 28-30.] Defendants argue that "[t]his action should be dismissed with prejudice to the extent that the Amended Complaint is construed as asserting claims against the Defendants for monetary damages in their official capacities" under the Eleventh Amendment, and that "to the extent that the Amended Complaint is construed as[ ]raising Federal Constitutional claims against the Defendants in their official capacities for monetary damages [under § 1983], all such claims should be dismissed with prejudice [pursuant to <u>Will</u>, 491 U.S. at 68, 71]." [Docket Item 149-1 at 29-30.]

The Court notes that Plaintiff, in the caption to the Amended Complaint, states: "All defendants are being sued in their individual and personal capacities[.]" [Docket Item 76 at 4.] The Court therefore finds that the Amended Complaint should be construed as raising constitutional claims against Defendants "in their individual and personal capacities[,]" rather than in their official capacities. Accordingly, the Court denies Defendants' motion as to this argument.

**B. Plaintiff's state-law negligence claim and the New Jersey Tort Claims Act**

Defendants argue that Plaintiff's claim for negligence under New Jersey law must be dismissed with prejudice for failure to file a timely pre-suit notice of tort claim, pursuant to the New Jersey Tort Claims Act ("NJTCA"), N.J.S.A. 59:8-3. [Docket Item 149-1 at 49-52.] Such notice must be in writing, Velez v. City of Jersey City, 817 A.2d 409, 417 (N.J. App. Div. 2003), and the filing of a complaint may not be substituted for compliance with the provisions of the NJTCA, Guzman v. City of Perth Amboy, 518 A.2d 758, 760-61 (N.J. App. Div. 1986). The NJTCA does permit, in some circumstances, the filing of a notice of claim beyond the prescribed 90-day window; such late notice of claim must be filed "within one year after the accrual" of the claim, and with the approval of a judge of the Superior Court, if the public entity or employee "has not been substantially prejudiced" by the delay, and if the claimant also submits "affidavits based on personal knowledge of the affiant showing sufficient reasons constituting extraordinary circumstances" for failing to file the notice of claim within the 90-day period or within a reasonable time thereafter. N.J.S.A. 59:8-9. If a claimant does not file a notice of claim within one year of the date of accrual of the claim, the court lacks jurisdiction to allow the claimant to proceed with a

lawsuit against the public entity based on that claim. Iaconianni v. N.J. Turnpike Auth., 565 A.2d 1084, 1086 (N.J. Sup. Ct. App. Div. 1989).

In response, Plaintiff states: "[I]n October 2012 plaintiff filed a tort claim while in administrative close segregation unit and gave it to unit officers to be process and mailed out." [Docket Item 153 at 1.] He continues: "Plaintiff filed a tort claim while in administrative segregation and gave it to officers because there is no mail boxes and Plaintiff is confined to a cell twenty-four hours a day, in trust that the officers mail the outgoing mail or send it to the mailroom for processing. Plaintiff receive[d] no response from the tort unit, so plaintiff filed [§] 1983 U.S.C. complaint with this court." Id. at 3.

In support of his claim that Plaintiff indeed timely filed the required notice of tort claim in October of 2012, Plaintiff filed with this Court a copy of that notice. [Docket Item 161.] While the notice does describe the two alleged assaults in June of 2012, [id. at 3] and bears Plaintiff's signature along with the date "10-1-12" [id. at 6], the notice also contains Plaintiff's handwritten response that the dates of the "occurrence or accident which gave rise to this claim" (i.e., the two alleged assaults) were "June 12, 15 2015" [sic]. Id. at

2.

Defendants responded to this exhibit by noting that "this document was not produced to the Defendants during fact discovery (even though the Defendants had requested from Plaintiff all notices of tort claim)[.]" [Docket Item 163 at 1.] Defendants requested leave of the Court to file supplemental briefing to address this document. Id. Plaintiff has filed additional documents, motions, and exhibits with the Court since the date of Defendants' letter and has not responded to or contested the Defendants' contention that he failed to furnish the notice of tort claim during discovery. [Docket Items 165, 166, 167, 168, 172, 173.] Nor did Plaintiff explain, either in his Response in Opposition [Docket Item 153] or in the letter preface to the notice of tort claim itself [Docket Item 161], why the notice of tort claim was not provided to Defendants when requested in discovery.

Federal Rule of Civil Procedure 37(c)(1) states: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless."

The Court can discern no basis for concluding that Plaintiff's failure to furnish the notice of claim when

Defendants requested it in discovery was "substantially justified"; nor has Plaintiff suggested any such justification.

The Court similarly finds that the failure to furnish the notice of claim was not harmless. Defendants' argument for summary judgment on the New Jersey negligence claim is premised on Plaintiff's alleged failure to timely file such a notice of tort claim.

Defendants submitted an affidavit of Stephanie Hargrove, a "Claims Investigator with the State of New Jersey Department of Treasury, Bureau of Risk Management[,]" which is dated September 27, 2016. [Docket Item 149-10.] Hargrove affirms that "as part of [her] regular duties," she is "responsible for the custody of all notices of claim filed with the Office of Attorney General and/or the departments and agencies of the State of New Jersey." [Id. at ¶ 2.] Hargrove states: "I have searched regularly maintained records in my custody to determine whether Pontell Bryant or anyone on his behalf filed a notice of claim with the Office of Attorney General and/or the departments or agencies of the State of New Jersey pertaining to the allegations made in this suit. . . . Neither Pontell Bryant nor anyone on his behalf filed a notice of claim with the Office of Attorney General and/or the departments or agencies of the State of New Jersey which pertain[] to the allegations made in this suit." [Id. at

¶¶ 5-6.] Simply put, Defendants' argument for summary judgment on the negligence claim primarily rises and falls on whether Plaintiff actually submitted the notice of claim in a timely fashion [Docket Item 149-1 at 49-52], and Defendants sought out Hargrove's affidavit to support the contention that Plaintiff did not do so. Plaintiff, in his response, does not contest Defendants' analysis or application of the requirements of the NJTCA, but rather argues that his negligence claim should not be dismissed because he did in fact file (to the best of his ability to do so) the notice of claim. [Docket Items 153, 161.] Accordingly, Plaintiff's failure to provide the notice of claim to Defendants during discovery is not harmless.

For those reasons, the Court finds that Plaintiff has not supplied a substantial justification for his failure to provide the notice of claim during discovery, and that the failure was not harmless. The Court accordingly finds that Plaintiff may not use the notice of claim, pursuant to F.R. Civ. P. 37(c)(1), to oppose Defendants' motion for summary judgment as to Plaintiff's negligence claim.[5]

_____

[5] Because the Court declines to allow Plaintiff to use the notice of claim under F.R. Civ. P. 37(c)(1), the Court need not address other concerns relating to the late furnishing of the notice of claim to Defendants (and, perhaps, only in response to Defendants' argument for summary judgment based on the failure to file such a notice) and what such late furnishing--coupled

Accordingly, the Court accepts the affidavit of Stephanie Hargrove and finds that there is no genuine dispute of material fact that Plaintiff failed to timely file a notice of claim so as to comply with the requirements of the NJTCA. The Court therefore lacks jurisdiction to entertain Plaintiff's state-law negligence claim and grants Defendants' motion for summary judgment as to that claim.[6]

## C. Constitutional Claims and Qualified Immunity

Defendants move for summary judgment on Plaintiff's § 1983 claims of excessive force under the Eighth Amendment; retaliation under the First Amendment; violation of his right to due process under the Fourteenth Amendment; and, to the extent that such a claim is asserted, violation of his right to equal protection under the Fourteenth Amendment. Additionally, Defendants invoke qualified immunity, arguing that all evidence indicates that Defendants acted reasonably under the

---

with the unusual mistake of erroneously stating the date of an incident to have taken place three years in the future (i.e., stating in 2012 that an incident alleged also to have occurred in 2012 took place in "2015" [Docket Item 161 at 2])--may imply about the notice of claim's authenticity.

[6] Because the Court grants Defendants' motion for summary judgment as to this claim without the need for supplemental briefing as Defendants requested [Docket Item 163], the Court will deny as moot that request.

circumstances and they must therefore be immune from suit.

The Court will address each constitutional claim below, turning first to the question of qualified immunity, and, if qualified immunity is to be denied, to the question of whether summary judgment should be granted for the claim.

### 1. Qualified Immunity Overview

The doctrine of qualified immunity "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009). Under this doctrine, government officials are immune from liability for civil damages as long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982); <u>Kelly v. Borough of Carlisle</u>, 622 F.3d 248, 253 (3d Cir. 2010). The doctrine "gives ample room for mistaken judgments" and "protect[s] all but the plainly incompetent or those who knowingly violate the law." <u>See</u> <u>Kelly</u>, 622 F.3d at 254 (internal quotation marks and citations omitted). Qualified immunity will not, however, act as a shield for "the official who knows or should know he is acting outside the law." <u>Butz v. Economou</u>, 438

U.S. 478, 506-07 (1978). In each case, the government's interests must be balanced against the citizens' interest in vindicating their constitutional rights, as well as the public interest in holding officials accountable "when they exercise power irresponsibly." Pearson, 555 U.S. at 231.

The qualified immunity defense is traditionally analyzed in two steps. First, the court must decide whether the facts alleged, taken in a light most favorable to the plaintiff, make out the violation of a constitutional right. Saucier v. Katz, 533 U.S. 194, 121 (2001). Next, the court must examine whether the right at issue was "clearly established" at the time of the challenged conduct. To be "clearly established," a right must be sufficiently clear such that a reasonable official would have known that his conduct was unlawful. Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012). Most recently, the Supreme Court emphasized again that while a case directly on point is not required to show that a right was "clearly established," "'existing precedent must have placed the statutory or constitutional question beyond debate.'" Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (citation omitted). The two prongs to the qualified immunity inquiry need not be analyzed in sequential order; courts have discretion to decide which of the two prongs to tackle first. Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011);

<u>Pearson</u>, 555 U.S. at 236.

At summary judgment, courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion. <u>United States v. Diebold, Inc.</u>, 369 U.S. 654 (1962) (per curiam); <u>Saucier</u>, 533 U.S. at 201. "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." <u>Scott v. Harris</u>, 550 U.S. 372, 378 (2007). In other words, the inquiry is the following: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right", and that the right was clearly established? <u>Saucier</u>, 533 U.S. at 201.

Although the question of qualified immunity is generally a question of law, "a genuine issue of material fact will preclude summary judgment on qualified immunity." <u>Giles v. Kearney</u>, 571 F.3d 318, 326 (3d Cir. 2009); <u>see also</u> <u>Curley v. Klem</u>, 298 F.3d 271, 278 (3d Cir. 2002) (noting that "a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis."). The court must deny summary judgment if, on the plaintiff's version of the facts, defendants violated the plaintiff's clearly established constitutional rights. <u>Giles</u>, 571 F.3d at 327 (finding that the district court was wrong to dismiss Eighth Amendment claims on

qualified immunity grounds because there was a factual dispute as to whether plaintiff had ceased resisting when he was kicked by officers, and that the court "must accept [the plaintiff's] version of the facts.").

The Court now turns to Plaintiff's substantive claims.[7]

## 2. Eighth Amendment Excessive Force Claim

Plaintiff claims that his Eighth Amendment right not to be subjected to cruel and unusual punishment was violated when Defendant corrections officers subjected him to excessive force by punching and kicking him while he was in restraints on two separate occasions.

---

[7] Plaintiff presents his causes of action as two separate causes of action, the first for "cruel and unusual punishment in violation of the first, and eight[h and] four[]teenth amendments to the U.S. Constitution[,]" and the second for negligence. [Docket Item 76 at 9.] Paragraph 21 of the Amended Complaint, detailing the first cause of action, states that the conduct of Defendants deprived Plaintiff of his constitutional rights "guaranteed under 42 U.S.C. [§] 1983 and the 1st, 4th, 5th, 8th and 14th Amendments[.]" Id. ¶ 21. However, a complete reading of the Amended Complaint does not reveal any basis for a claim of a violation of Plaintiff's 4th or 5th Amendment rights, as the sole basis for Plaintiff's claims are the two alleged assaults on June 12 and June 15, 2012 and the subsequent disciplinary proceedings which he alleges to have constituted retaliation. [Docket Item 76.] Accordingly, the Court will address Plaintiff's claims as follows: first, an Eighth Amendment excessive force claim; second, a First Amendment retaliation claim; third, a Fourteenth Amendment due process claim; and fourth, a Fourteenth Amendment equal protection claim.
To the extent that Plaintiff alleges a Fourth Amendment or Fifth Amendment claim, such claims are dismissed without prejudice for failure to state a claim. F.R. Civ. P. 12(b)(6).

Defendants argue that "even if one affords Plaintiff all reasonable inferences, the Defendants' actions entitle them to qualified immunity." [Docket Item 149-1 at 46.] They continue: "The Defendants' actions as documented in the record are objectively reasonable in that they did not exert force upon Plaintiff. However, should the qualified immunity analysis continue, it is also apparent that the Defendants' actions did not violate clearly established law. . . . The Defendants, as corrections officers, are entitled to move inmates about a correctional facility, to use objectively reasonable force as needed, and to file disciplinary charges against inmates." Id. at 48. They argue that, for this reason, they are entitled to judgment as a matter of law on all of Plaintiff's constitutional claims. Id. at 48-49.

The Court does not agree that Defendants' argument for qualified immunity in this context "affords Plaintiff all reasonable inferences." Quite the opposite; this argument takes as a given that Defendants appropriately 1) moved Plaintiff about a correctional facility, 2) either did not use force or used objectively reasonable force as needed against Plaintiff, and 3) filed disciplinary charges against Plaintiff. These are, of course, precisely the factual circumstances that Plaintiff contests with vigor.

As the Third Circuit in <u>Giles</u> noted, "a genuine issue of material fact will preclude summary judgment on qualified immunity." 571 F.3d at 326. The factual circumstances of <u>Giles</u> are on point with the instant case, where defendant correctional officers (in their individual capacities) were granted summary judgment on an excessive force claim under qualified immunity, and the Court will accordingly look to that case:

> The primary step in assessing the constitutionality of the officers' alleged actions is to determine the relevant facts. The District Court was required to view the facts in the light most favorable to the plaintiff. Also, an inmate who is proceeding <u>pro</u> <u>se</u>, is in a decidedly difficult position from which to generate "record evidence" on his behalf . . . under these circumstances, his affidavits . . . are about the best that can be expected from him at the summary judgment phase of the proceedings. Giles testified that he was kicked in the ribs and punched in the head while restrained on the ground, after he ceased to resist. Accepting Giles' version of the events as true, he has alleged facts showing that Cassase, Steele and Campbell violated his Eighth Amendment rights during the shower incident.

<u>Id.</u> (internal citations and quotations removed).

The court also found that "at the time of the incident in 2001, it was established that an officer may not kick or otherwise use gratuitous force against an inmate who has been subdued." <u>Id.</u> The court reversed the District Court's grant of summary judgment because the District Court's conclusion that an "'objective review of the record demonstrates that officials . . . could disagree as to whether the force used by these

defendants against plaintiff, an assaultive inmate, was
excessive under the circumstances' . . . rest[ed] on a factual
presumption that is inappropriate on summary judgment. A dispute
of material fact exists as to whether Giles had ceased resisting
at the point at which he was kicked or 'kneed' in the side[,]"
despite the facts that 1) "Giles had been found guilty in an
administrative hearing of assaulting a correctional officer for
hitting Blades" and 2) "that Giles had pled no contest in state
court to assault in the third degree for the same conduct." Id.
at 327.

The court stated that, although the "Appellees contend that
Giles was still struggling . . . or at least that a reasonable
officer could perceive that to be the case[,]"

> we must accept Giles' version of the facts. The
> administrative assault determination and state court
> no contest plea for Giles' hitting Blades, before he
> was wrestled to the ground, do not provide a blank
> check justification for correctional officers'
> excessive use of force thereafter.
>
> Because Giles testified that he was hit and kicked
> while restrained on the ground, after he ceased to
> resist, Giles alleges conduct by the officers in
> violation of his Eighth Amendment rights that a
> reasonable officer would have known was a violation
> under the circumstances. No reasonable officer could
> agree that striking and kicking a subdued,
> nonresisting inmate . . . was reasonable or necessary
> under established law. Accordingly, because accounts
> of this critical event were controverted, on summary
> judgment it was improper to dismiss Giles' complaints
> against Cassase, Steele and Campbell on the basis of
> qualified immunity.

Id. at 327-28. The court also noted that, while "denying summary judgment because a material issue of fact remains on an excessive force claim is improper on a qualified immunity inquiry[,]" denying summary judgment on that qualified immunity inquiry where "disputed facts are material to the qualified immunity analysis" does not represent "an improper 'fusion' of qualified immunity analysis and the merits analysis of Giles' constitutional claim." Id. at 327 n.4.

Here, accepting Plaintiff's allegations as true, as Giles states this Court must do, Plaintiff sufficiently alleges a violation of his Eighth Amendment rights because he alleges that he was "hit and kicked while restrained on the ground," which Giles states "no reasonable officer could agree . . . was reasonable or necessary under established law." Id. at 327. See generally Hudson v. McMillian, 503 U.S. 1, 6-10 (1992); Whitley v. Albers, 475 U.S. 312, 320-21 (1986). This right was deemed to be clearly established in 2009, when Giles was decided, referring back to an incident that allegedly occurred in 2001. Accordingly, the Court denies Defendants' motion for dismissal on qualified immunity grounds as to Plaintiff's claims under the Eighth Amendment.

The Court next turns to Defendants' argument for summary judgment on this claim. Defendants argue that the evidentiary

"record does not show that any physical altercation took place between Plaintiff and the Defendants, and thus, there is not even a scintilla of evidence that the Defendants applied excessive force upon Plaintiff." [Docket Item 149-1 at 33.] They argue that Plaintiff's testimony and allegations that he was assaulted on two occasions "is contradicted by the remainder of the record in that it contains no physical altercation took place whatsoever [sic]." Id. at 34.

In Defendants' telling, the evidentiary record shows only that

> on June 12, 2012, Plaintiff was handcuffed and moved from one cell to another without incident and that the Defendants had some involvement in those movements, and that on June 13, he had exposed himself to defendant Herman and made a sexual proposal or threat. In addition to there being no record of any physical altercation, Plaintiff's medical and mental health records from the weeks and months following June 2012 not only show no evidence of any of the physical injuries he allegedly suffered and no complaints of injuries or assaults, but they affirmatively note the absence of any such injuries.
>
> Plaintiff's version of the events . . . is "blatantly contradicted by the record, so that no reasonable jury could believe it," and the court should not consider it. Scott, supra, 550 U.S. at 380-81.

[Docket Item 149-1 at 34-35 (internal citations to the evidentiary record omitted).] Defendants submit that allowing this claim to proceed to trial when "the plaintiff's own testimony comprises the only indication that a physical

altercation underlying the excessive force claim ever occurred[]
is tantamount to affording the plaintiff the right to a trial
solely on the weight of an accusation of excessive force." Id.
at 35.

The Court does not agree that this is the case where
Plaintiff's version of the events is so "blatantly contradicted
by the record" under Scott that the Court must conclude that no
reasonable factfinder could credit that account. The Court must
assess the evidentiary record in the light most favorable to
Plaintiff, while also being mindful of Plaintiff's pro se status
and the attendant difficulties he may face (and, indeed, alleges
he has faced) in obtaining discovery materials.

Plaintiff testified at his deposition, under oath, that he
was assaulted on two separate occasions by Defendants. [Docket
Item 149-20 at 6-15.] He testified that he suffered injury to
his hip and his arm, but that he could not visually assess
himself for injuries after the assault (on June 12) because
there were no mirrors in detention. Id. at 10, 12. Plaintiff
also alleged in the Amended Complaint that he suffered injuries
to his head, back, neck, and leg as a result of the assaults.
[Docket Item 76 ¶ 18.] He contested at the deposition that he
was medically evaluated on June 12 by RN Mary Ellen Green, whose
report of that date states that Plaintiff "ha[d] no abrasions or

lacerations on upper torso and has old tattoos on arms" and
"[m]edically cleared" Plaintiff "for transfer to detention,"
stating that the nurse "falsely entered" this entry onto his
medical chart. [Docket Item 149-20 at 12.] He also testified
that he suffered "emotional stress" as a result of the assaults
and takes two psychiatric medications. Id. at 10. Plaintiff
testified that, within one or two days of the second assault, he
requested medical attention and was subsequently committed to
the infirmary because his "blood pressure and . . . vital signs"
were abnormal; he also noted that when tests were run on him in
the infirmary, they found blood in his urine. Id. at 14-15.

The Court is aware that Plaintiff's account of how he ended
up in the infirmary is not supported by his medical records,
primarily on the issue of the timing of such admission, as his
medical records appear to reflect that he was transferred to the
infirmary on June 23, 2012, over a week after the date of the
second alleged assault. However, Plaintiff's medical records do
reflect blood in his urine, which could have resulted from a
physical assault that led to internal damage to his kidneys or
other organs. [Docket Item 151-1 at 51-59.] Defendants have
proffered no alternative explanation for this apparently
uncontroverted medical finding, which a reasonable finder of
fact could accept in support of Plaintiff's contention that he

was assaulted by Defendants.

In further support of Plaintiff's sworn testimony, the Court notes in the evidentiary record the Special Custody Reports filed by COs Cope, Butler, Clark, and Downs on June 12, 2012. [Docket Item 149-22 at 14-16.] All of these reports appear to have been prepared on June 12, 2012 (despite the date of "6-13-12" appearing on CO Cope's report, as described supra, Section II.A., n.2) and all describe the transport of Plaintiff on June 12, 2012 as having occurred "without incident." Id. As Judge Aldisert of the Third Circuit has stated: "These abundant assurances call to mind the words of Shakespeare: 'The lady doth protest too much, methinks.'" Harris v. Reeves, 946 F.2d 214, 226 (3d Cir. 1991) (Aldisert, J., dissenting) (quoting William Shakespeare, Hamlet, act 3, sc. 2, line 242). See also U.S. v. Allied Stevedoring Corp., 241 F.2d 925, 933 (2d Cir. 1957) ("Again and again in all sorts of situations we become satisfied, even without earlier contradiction, not only that a denial is false, but that the truth is the opposite"). It seems fair to presume that corrections officers at SWSP effect hundreds, if not thousands, of transports of inmates between cells and other locations in that facility yearly. Without more context for why the Special Custody Reports were prepared, and whether such reports are prepared as a matter of course for each

of those hundreds or thousands of transports, a reasonable fact-finder could find that the preparation of such reports similarly constitutes "too much" protest.

Defendants' contention is that, on June 12, 2012 (the date those reports were prepared), all Defendants (and the entire SWSP administration) lacked knowledge of any altercation or "incident" that occurred involving Plaintiff and corrections officers because no such incident occurred; they also aver (as part of their argument that Plaintiff failed to exhaust his administrative remedies, see infra Section IV.D., by failing to file an IRF regarding any alleged assault on June 12, 2012) that they had no knowledge that Plaintiff was alleging such an altercation to have taken place on June 12 at least through the SID investigation that took place in late July of 2012. If that is so, a reasonable fact-finder is entitled to draw an inference that there would have been no apparent reason to prepare a report simply to state that a normal prison action (i.e., the transport of an inmate from one part of the prison to another) occurred without incident, and from that inference, find that the evidentiary record supports Plaintiff's testimony that an incident did, indeed, occur on June 12.

Defendants also argue that this Court "may not consider any facts or evidence that would contradict prison disciplinary

proceedings regarding the same incident, 'unless the finding of guilt has been reversed or otherwise impaired.' Concepcion v. Morton, 125 F. Supp. 2d 111, 123 (D.N.J. 2000), rev'd on other grounds, 306 F.3d 1347 (3d Cir. 2002)." [Docket Item 149-1 at 33.] This is, they argue, in accordance with the precedents of Heck v. Humphrey, 512 U.S. 477, 485-87 (1994) and Roth v. Koppers Indus., Inc., 993 F.2d 1058, 1061 (3d Cir. 1993). Id.

The Court does not find Defendants' argument on this point persuasive. Other courts' decisions on this issue, within this district, have refined the analysis based on Heck; the dispositive issue is not whether the still-valid prison disciplinary findings or punishment stem from the same incident, but rather "'that a section 1983 claim cannot be pursued if it would necessarily imply that the earlier determination process was invalid.'" Johnson v. NJDOC, No. 11-5764, 2015 WL 5603630, *4 (D.N.J. Sept. 23, 2015) (quoting Lassiter v. Sherrer, No. 09-2979, 2011 WL 4594203, *7 (D.N.J. Sept. 30, 2011)). As a matter of logic (and not as a matter of crediting Plaintiff's account in its entirety or Defendants' account in its entirety), it is entirely possible for Plaintiff to have been assaulted on June 12 and June 15, 2012, and also to have committed the disciplinary infractions described in the charges filed by defendants Rivera and Herman (although Plaintiff does dispute

that he did so and alleges that those charges were fabricated as retaliation). No implication arises that the disciplinary process was "invalid" from a conclusion that, for example, all four incidents in fact occurred. For that reason, the Court does not find Defendants' argument here persuasive and declines to grant summary judgment on Plaintiff's excessive force claim based on Concepcion and Heck.

Accordingly, while the Court recognizes that the evidentiary record (e.g., Plaintiff's medical records) contradicts Plaintiff's account of the events underlying this lawsuit in many respects, the Court is unwilling to conclude that this is the case contemplated in Scott where the non-movant's "version of events is so utterly discredited by the record that no reasonable jury could have believed him" and thereby constitutes a "visible fiction." 550 U.S. at 380, 381. See also McDowell v. Sheerer, 374 Fed. App'x 288, 292-93 (3d Cir. 2010) ("[W]e conclude that the District Court should have accepted McDowell's version of events when ruling on this question because neither of the videos blatantly contradict[s] McDowell's account such that no reasonable jury could believe it. . . . Accepting [his] account, as we must in this posture, we conclude that he did raise a genuine issue of material fact on his excessive force claim. His testimony that he was

restrained and not resisting directly contradicts that of
Defendants, and resolution of this factual issue is material to
deciding whether [he] has established that his constitutional
rights were violated"). Plaintiff's account does find some small
measure of support in the evidentiary record. Cf. Felder v. New
Jersey, No. 03-6100, 2006 WL 3751347, *5 (D.N.J. Dec. 19, 2006)
("The only evidence in the record that supports Plaintiff's
excessive force claim is Plaintiff's controverted testimony")
(emphasis added); Lassiter, 2011 WL 4594203, supra, at *9
(although plaintiff alleged fabrication and withholding of
evidence, "plaintiff has failed to provide a scrap of
evidentiary material to support his recollection of events").
For that reason, the Court will deny Defendants' motion for
summary judgment with regard to Plaintiff's claim of excessive
force under the Eighth Amendment and § 1983.


   **3. First Amendment Retaliation Claim**

   Plaintiff's claim of retaliation is premised on the
argument that the first disciplinary charge against him was
filed in retaliation "for refusing to assault another inmate at
defendant Rivera's request . . . , while the second was filed in
retaliation after he complained about receiving the first
disciplinary charge." [Docket Item 149-1 at 39.] The Court also

discerns a basis in the Amended Complaint for a claim of retaliation in the following allegation: "Defendants S/C.O. J. Rivera, Janda and Curtis with Sgt. Downs escorted Plaintiff from housing unit 2-1-R to Fase 1 center control holding cell on 6-12-12 at approx. 9:25 am while at S.W.S.P. While Plaintiff was in restraints, plaintiff tried to speak to a supervisor, at which time plaintiff[] was arbitrarily subjected to unjustifiable excessive force by all named defendants which plaintiff was arbitrarily thrown to the floor face first, [and] arbitrarily kicked and punched while in restraints." [Docket Item 76 ¶¶ 13, 10.] At his deposition, Plaintiff described the grounds for his retaliation claim as follows: "When I tried to speak to the sergeant about what happened when I was assaulted on June 12th, when I tried to speak to the supervisor to Sergeant Janda about what happened, what was going on, it hindered my speech." [Docket Item 149-20 at 15.]

Defendants argue that they are entitled to summary judgment on this claim because there is no genuine dispute of material fact "that defendant Rivera asked [Plaintiff] to assault another inmate, nor has he shown any connection between his purported refusal of this request and the filing of either of the disciplinary charges or the alleged assaults." [Docket Item 149-1 at 39.] The Court disagrees, and will deny Defendants' motion

for summary judgment on Plaintiff's claim of retaliation.

To the extent that Defendants' argument for dismissal on qualified immunity grounds applies to this claim, the Court finds that, as in the context of Plaintiff's Eighth Amendment claims, Defendants' qualified immunity argument presumes (as to each constitutional claim) that no reasonable factfinder can credit Plaintiff's account. While Defendants may argue that they are entitled to "file disciplinary charges against inmates," they are not entitled to do so falsely in retaliation for the inmate's exercise of his First Amendment rights. Plaintiff alleges that this latter scenario is, in fact, what occurred. The Court finds, for the reasons stated below, that a reasonable fact-finder could credit this account. Accordingly, qualified immunity is not warranted here because there is a genuine dispute of material fact, inasmuch as no reasonable officer could conclude that filing false disciplinary charges against an inmate for the exercise of his or her First Amendment rights comports with the Constitution. See Mitchell v. Horn, 318 F.3d 523, 529-30 (3d Cir. 2003) (citing Babcock v. White, 102 F.3d 267, 275-76 (7th Cir. 1996)) (allegation that inmate was falsely charged with misconduct in retaliation for filing complaints against officer implicates conduct protected by the First Amendment).

As for summary judgment, a prisoner-plaintiff must establish three elements to prevail on a claim of retaliation under 42 U.S.C. § 1983: 1) "that the conduct which led to the alleged retaliation was constitutionally protected"; 2) "that he suffered some 'adverse action' at the hands of the prison officials"; and 3) that there is "a causal link between the exercise of his constitutional rights and the adverse action taken against him." <u>Rauser v. Horn</u>, 241 F.3d 330, 333 (3d Cir. 2001).

Again, the Court is obliged to take the evidentiary record and consider it in the light most favorable to Plaintiff. The Court has already found that a reasonable fact-finder could conclude that Plaintiff was, as he has testified, assaulted on two separate occasions. <u>See</u> Section IV.C.2., <u>supra</u>. A reasonable fact-finder could similarly credit Plaintiff, rather than Defendants, when he states that on June 12, 2012, he was assaulted when he asked to speak to a supervisor, and on June 15, 2012, the corrections officers who assaulted him yelled, "This is for [defendant] Rivera!"

It would be inappropriate, at summary judgment, for the Court to agree with Defendants that summary judgment should be granted on the basis that Plaintiff hasn't adduced sufficient evidence to show that he engaged in constitutionally-protected

conduct "because the record contradicts the allegation that
defendant Rivera ever asked him to assault another inmate."
[Docket Item 149-1 at 41.] That determination is a credibility
determination to be made by the ultimate finder of fact, and not
by this Court on Defendants' motion for summary judgment. The
Court similarly disagrees that this Court should rule, as a
matter of law, that "the record lacks evidence supporting any
connection between a request to assault another inmate, the
disciplinary charges, and the alleged assaults on Plaintiff."
Id.

There are genuine disputes of material fact that cannot be
resolved in this summary judgment motion. The Court finds that
Plaintiff has adduced sufficient evidence, through his sworn
testimony and additional evidence in the record, for a
reasonable fact-finder to conclude that he was retaliated
against by being assaulted for either: refusing to assault
another inmate at defendant Rivera's behest; asking to speak to
a supervisor on June 12, 2012; complaining about the
disciplinary charge defendant Rivera filed against him; or some
combination thereof. This is sufficient to establish a basis for
a reasonable finder of fact to find in Plaintiff's favor on the
first prong of the retaliation analysis. See Mitchell, 318 F.3d
at 529-30.

Plaintiff has similarly adduced sufficient evidence to raise a genuine dispute of material fact that he was subjected to "adverse action," inasmuch as he has testified that he was assaulted twice. Cf. Rauser, 241 F.3d at 333 (adverse action established by denial of parole, transfer to distant prison where family could not visit regularly, and financial penalization); Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000) (adverse action is that which is "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights").

Defendants contest that this prong has been met by arguing that Plaintiff "has not suffered harm sufficient to constitute adverse action" because Plaintiff "continued to use inmate remedy forms . . . to address a number of concerns about prison life," even after the alleged assaults, which undermines the contention that "he suffered adverse action sufficient to rise to the level of a constitutional violation and that his speech was chilled as a result of the alleged retaliation." [Docket Item 149-1 at 43.] They point to precedent where retaliation claims were found not to be established because they were "bare assertions" or "bare allegation[s] of retaliatory motive." Id. at 41-42 (citing Prisoner's Legal Association v. Roberson, No. 91-CV-04460, 1997 WL 998592, *5 (D.N.J. Nov. 19, 1997)). Given,

however, that the court in <u>Rauser</u> had little difficulty concluding that a transfer to a different facility, financial penalties, and a denial of parole constituted "adverse action" for the purposes of a retaliation claim, this Court similarly finds that being physically assaulted by corrections officers constitutes "adverse action" "sufficient to deter a person of ordinary firmness from exercising" his or her constitutional rights. This is so regardless of whether Plaintiff continued to file IRFs or not, as the inquiry is an objective one, and not a subjective one. Plaintiff does not make a bare allegation of retaliatory motive; he alleges that he was retaliated against by, <u>inter alia</u>, being assaulted twice. This is sufficient.

Furthermore, to the extent that Plaintiff is saying he was retaliated against by having false allegations of indecent exposure filed against him as disciplinary charges, that constitutes an adverse action under Third Circuit precedent. <u>See</u> <u>Robinson v. Taylor</u>, 204 Fed. App'x 155, 157 (3d Cir. 2006) (citing <u>Mitchell</u>, 318 F.3d at 530); <u>Smith v. Mensinger</u>, 293 F.3d 641, 653 (3d Cir. 2002) (citing <u>Milhouse v. Carlson</u>, 652 F.2d 371, 374 (3d Cir. 1981)).

Finally, as to the third prong, a reasonable factfinder may credit Plaintiff's account that, as he was being assaulted on June 15, 2012, one of his assailants yelled that "This is for

Rivera!" This suffices to establish a basis for a reasonable finder of fact to infer a causal link between Plaintiff's protected conduct (i.e., complaining about or refusing the request of defendant Rivera[8]) and the adverse action he alleges he suffered. See Lawrence v. Lanigan, No. 12-0393, 2012 WL 4490574, *6 (D.N.J. Sept. 27, 2012).

Summary judgment against Plaintiff on his claim of retaliation is not appropriate. The Court will therefore deny Defendants' motion as to that claim.

### 4. Fourteenth Amendment Due Process Claim

To the extent that Plaintiff argues he was denied due process in connection with his disciplinary proceedings on the two .052 charges, Defendants argue that such a "claim should be dismissed because he was afforded notice and an opportunity to defend himself against the charges." [Docket Item 149-1 at 35-36, citing Smith, 293 F.3d at 653-54, and Freeman v. Rideout, 808 F.2d 949, 951, 953 (2d Cir. 1986).] Defendants submit that this is because, first, the Third Circuit in Smith approved the

---

[8] Defendants are free to argue that, to the extent such a statement was made, it would refer to Plaintiff's having exposed himself to defendant Rivera. However, the Court here is obliged to credit Plaintiff's account, which suggests that the assault was not in retaliation for any indecent exposure but rather for denying Rivera's request and/or for complaining about her.

Second Circuit's framework in <u>Freeman</u> of analyzing a due process
complaint regarding misconduct hearings where the now-plaintiff
alleged the use of falsified evidence/groundless misconduct
reports. That framework requires only that the now-plaintiff is
afforded notice and an opportunity to defend himself. [Docket
Item 149-1 at 37-38.] Second, Defendants argue, there is no
"atypical" deprivation of prison life that implicates a liberty
interest under <u>Sandin v. Conner</u>, 515 U.S. 472 (1995).

Here, as above, Defendants' qualified immunity argument
rests on the premise that Plaintiff's account of these events
could not be credited by a reasonable factfinder. Because the
Court has already rejected this premise, the Court declines to
find for Defendants on qualified immunity grounds.

Turning to the argument for summary judgment, however, the
Court finds Defendants' argument persuasive. In <u>Smith</u>, the Third
Circuit addressed a due process claim premised on a correctional
officer's "misconduct report [that was issued] to retaliate
against Smith for his conduct toward [the officer] and to cover
up a beating. Thus, Smith claims that the misconduct report was
not intended to enforce prison regulations at all, and it was
therefore improper to impose a disciplinary sanction." 293 F.3d
at 652. The court acknowledged the holding of <u>Sandin</u> that
established that "confinement in administrative or punitive

segregation will rarely be sufficient, without more, to
establish the kind of 'atypical' deprivation of prison life
necessary to implicate a liberty interest." Id. at 653 (citing
Sandin, 515 U.S. at 486). The court continued: "Prison
disciplinary proceedings may, however, constitute a denial of
due process in the context of a civil rights action under § 1983
when they are instituted for the sole purpose of retaliating
against an inmate for his/her exercise of a constitutional
right[,]" citing Seiverling, 229 F.3d at 224. Smith, 293 F.3d at
653. As Seiverling states, although "placement in administrative
confinement will not generally create a liberty interest[,]"
"[r]etaliation may be actionable . . . even when the retaliatory
action does not involve a liberty interest . . . if motivated in
substantial part by a desire to punish an individual for
exercise of a constitutional right." Seiverling, 229 F.3d at 224
(internal quotations omitted). The Third Circuit stated: "We
have previously held that falsifying misconduct reports in
retaliation for an inmate's resort to legal process is a
violation of the First Amendment guarantee of access to the
courts." Smith, 293 F.3d at 653 (citing Milhouse, 652 F.2d at
374).

   In Milhouse, the plaintiff claimed that fabricated
misconduct charges were filed against him in retaliation for his

filing of a civil rights suit against prison officials. 652 F.2d at 374. The Third Circuit found that this claim was sufficient to state a violation of "Milhouse's first amendment right of access to the courts." Id. However, Smith (unlike Milhouse) claimed that misconduct charges were fabricated against him in retaliation for Smith's conduct towards the corrections officer and to cover up the beating, which the Third Circuit stated "implicates no constitutional right and therefore can[]not overcome the hurdle erected by the holding in Sandin." Smith, 293 F.3d at 653. When that is the case, all that is required to satisfy due process is "an opportunity to be heard and to defend against the allegedly false misconduct reports." Thomas v. McCoy, 467 Fed. App'x 94, 97 (3d Cir. 2012) (citing Smith, 293 F.3d at 653-54).

Plaintiff was undisputedly provided with an opportunity to be heard and to defend against the allegedly false .052 charges defendants Rivera and Herman filed against him. His retaliation claim proceeds. See Section IV.C.3., supra. The Court understands this to satisfy the holdings of Milhouse, Mitchell, and Smith, inasmuch as Plaintiff claims the fabrication of disciplinary charges against him (in retaliation for his exercise of his First Amendment rights) violated his constitutional rights. However, this does not allow for a due

<u>process</u> claim under <u>Smith</u>. <u>See</u> <u>Lawrence</u>, 2012 WL 4490574, at *5;

<u>Carter v. Owens</u>, No. 17-cv-00182, 2017 WL 3107204, at *13-*14

(D.N.J. July 21, 2017). Accordingly, the Court will grant

summary judgment to Defendants as to Plaintiff's Fourteenth

Amendment due process claim.


### 5. Fourteenth Amendment Equal Protection Claim

At his deposition, but not in the Amended Complaint,

Plaintiff stated his intention to claim a violation of his right

to equal protection under the Fourteenth Amendment. To the

extent that such a claim has been stated, the Court dismisses

that claim.

At his deposition, Plaintiff was asked about the basis for

his 14th Amendment claim, to which he responded: "They're

supposed to treat everything equal. I believe that's part of the

14th Amendment. So by using excessive force and writing

falsified charges and, you know, using verbal threats and verbal

harassment is also a violation of the 14th Amendment." [Docket

Item 149-20 at 15.]

Defendants argue that any equal protection claim "would

ultimately fail because the record does not show that he was

singled out for discrimination or discriminated against as a

result of his membership in a protected class"; they argue, in

the alternative, that to the extent his equal protection claim is construed as a "class-of-one" claim, the record similarly does not support a claim of "arbitrary and intentional discrimination." [Docket Item 149-1 at 44.]

The Court agrees that Plaintiff has not adequately pled that he is a member of a protected class. See Abdul-Akbar v. McKelvie, 239 F.3d 307, 316-317 (3d Cir. 2001); City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). Nor has he (at this time) adduced evidence from which a reasonable factfinder could conclude, for the purposes of a "class-of-one" equal protection claim, that Defendants "intentionally" "treated him differently from others similarly situated" and that "there was no rational basis for the difference in treatment[,]" inasmuch as he has not adduced evidence about the treatment of other inmates who might have been similarly situated to him. See Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d Cir. 2006).

Accordingly, the Court will dismiss any equal protection claims that Plaintiff asserts at this time under the § 1983 and the Fourteenth Amendment. F.R.C.P. 12(b)(6). However, such dismissal shall be without prejudice.


## D. Administrative Exhaustion under the PLRA

Finally, Defendants renew their argument that the Court may

not entertain Plaintiff's claims under § 1983 because Plaintiff failed to exhaust his administrative remedies, as required by the PLRA, 42 U.S.C. § 1997e(a). While Defendants previously argued this issue on the premise that Plaintiff never filed an IRF regarding either of these alleged assaults [Docket Item 35-1 at 6-11], they now renew this argument, despite the existence of the 6-15-12 IRF, on the grounds that the 6-15-12 IRF does not suffice to establish administrative exhaustion, primarily because it does not identify the acts and individuals Plaintiff now sues. [Docket Item 149-1 at 19.]

The Court has no quarrel with Defendants' contention that Plaintiff is subject to the PLRA's exhaustion requirement, see 42 U.S.C. § 1997e(a); Porter v. Nussle, 534 U.S. 516, 532 (2002); Ahmed v. Dragovich, 297 F.3d 201, 210 (3d Cir. 2002), nor with the uncontroversial contention that "the NJDOC's Inmate Remedy System meets the definition of an 'Administrative Remedy' within § 1997e(a)'s exhaustion requirement" [Docket Item 149-1 at 21]; see Concepcion v. Morton, 306 F.3d 1347 (3d Cir. 2002).

However, the Court is not persuaded at this juncture that Plaintiff in fact, as Defendants contend, "failed to exhaust his available administrative remedies." [Docket Item 149-1 at 22.]

Contrary to what Defendants asserted earlier in the course of this litigation, Plaintiff did in fact submit an IRF

complaining of having been assaulted by a defendant (namely,

Jackson) on June 15, 2012. Although Defendants submit that this

IRF "report[s] what reasonably appears to be a distinct

incident" [id. at 26] in light of the inconsistencies between

the IRF's allegations and the current ones, the Court finds that

there is, at the very least, a genuine dispute of material fact

about whether this is the same as one of the two incidents upon

which Plaintiff now bases this lawsuit.

Defendants also argue that Plaintiff did not submit an IRF

regarding any alleged assault that happened on June 12, 2012,

and that he therefore failed to exhaust his administrative

remedies concerning any claim arising out of any incident

alleged to have occurred on that date. [Id. at 25-26.] However,

in light of history of this litigation, the Court is reluctant

to conclude that this is so as a matter of law. The record is

clear that Defendants initially believed that Plaintiff filed no

relevant IRFs, but one nevertheless turned up, having been

"inadvertently" not recorded in SWSP's database and

"inadvertently" not returned to Plaintiff. Moreover, Plaintiff's

letter to his mother, which was forwarded to SID in short order

and duly investigated, appears to be dated "6-13-12" and

includes Plaintiff's allegation that he filed between one and

three relevant remedy forms. Such forms, if the date on the

letter is correct, could not logically refer to an incident occurring on June 15, 2012. While under general circumstances, the lack of a record of any such remedy forms in NJDOC's records or databases might lead the Court to conclude that no such remedy forms were filed, the Court is reluctant to do so here.

Furthermore, there remain questions of fact about whether the steps Plaintiff took to alert administrators at SWSP and NJDOC sufficed to establish his substantial compliance with NJDOC's administrative remedy scheme, as is required under the PLRA, even if they did not comply in every particular with the dictates of the relevant inmate handbooks. See Small v. Camden County, 728 F.3d 265, 272 (3d Cir. 2013) (citing Spruill v. Gillis, 372 F.3d 218, 232 (3d Cir. 2004)) (substantial compliance with prison's grievance procedures required to complete the administrative review process under the PLRA).

As such, the Court finds that there is a genuine dispute of material fact as to whether Plaintiff adequately utilized the administrative remedies available to him with regard to alleged assaults that occurred on June 12 and June 15, 2012 so as to satisfy (i.e., substantially comply with) the administrative exhaustion requirements of the PLRA.

However, as "exhaustion is a question of law to be determined by a judge, even if that determination requires the

resolution of disputed facts," <u>Small</u>, 728 F.3d at 269, this
Court is the party who must resolve this issue. <u>See also</u> <u>Drippe</u>
<u>v. Tobelinski</u>, 604 F.3d 778, 781-82 (3d Cir. 2010). The Court
will therefore order an evidentiary hearing to establish whether
Plaintiff substantially complied with the administrative remedy
scheme available to him. Such a hearing was originally suggested
by Defendants in an earlier filing in the event that the Court
conclude that there exists "a genuine issue of fact" on the
question of administrative exhaustion under the PLRA [Docket
Item 41 at 7], and the Court agrees that such a hearing is
appropriate and necessary at this juncture.

Because there will be a factual hearing, it may be
advisable to appoint <u>pro</u> <u>bono</u> counsel for Plaintiff, including
an effort to negotiate and resolve this case without trial. If
Plaintiff seeks appointment of counsel, he should so request on
form to be provided to him by the Clerk's Office consistent with
Appendix H of the Local Civil Rules of this Court.

## V. CONCLUSION

For the foregoing reasons, the Court grants in part and
denies in part Defendants' motion for summary judgment. The
motion is denied as to Plaintiff's claims under the Eighth and
First Amendments. The motion is granted as to Plaintiff's claims
under the Fourteenth Amendment and his state-law claim of

negligence. The Court denies as moot Defendants' request for leave to file supplemental briefing, and orders an evidentiary hearing on the question of administrative exhaustion.


 **September 29, 2017**                       **s/ Jerome B. Simandle**
Date                                         JEROME B. SIMANDLE
                                             U.S. District Judge